Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

ATTORNEY FOR APPELLANT:

**JILL M. ACKLIN**
Acklin Law Office, LLC
Westfield, Indiana

ATTORNEYS FOR APPELLEE:

**PATRICK M. RHODES**
Indiana Department of Child Services
Indianapolis, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

FILED

Mar 07 2013, 9:06 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) ) | |
| A.A., S.T., & C.P. (MINOR CHILD) AND A.A. (MOTHER), | ) ) ) ) | |
| Appellant-Respondent, | ) ) | No. 49A02-1206-JT-511 |
| vs. | ) ) | |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

---

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn Moores, Judge
The Honorable Larry Bradley, Magistrate
Cause No. 49D09-1109-JT-34392, 49D09-1109-JT-34393, 49D09-1109-JT-34394

---

**March 7, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

A.A. ("Mother") appeals the involuntary termination of her parental rights to her children, A.A., S.T., and C.P., claiming that there is insufficient evidence supporting the trial court's judgment.

We affirm.

**Facts and Procedural History**

Mother is the biological mother of A.A., born in April 2004, S.T. born in June 2005, and C.P. born in March 2010 (collectively referred to as "the children"). S.T. is the biological father of A.A. and S.T. K.P. ("Father") is the biological father of C.P.[1] The facts most favorable to the judgment reveal that in early May 2010, DCS found the children's home to be in deplorable and unsafe condition. Trash and dog feces were littered throughout the house. The smell was unbearable. There was no food in the home. The walls lacked drywall in places. The stairs were rotting and some were missing. There were broken pieces of wood and debris throughout the second level of the home. Mother and Father were living in the home at the time, along with the children. Mother and Father were both unemployed and addicted to drugs. Mother was addicted to Vicodin, which she admitted using everyday except when she was pregnant. Father admitted smoking marijuana.

As a result of its assessment, Marion County Department of Child Services ("MCDCS") took the children into custody and filed petitions under separate cause numbers alleging A.A., S.T., and C.P. were children in need of services ("CHINS"). The juvenile court adjudicated

---

[1] The parental rights of all three biological parents: Mother, S.T., and Father were terminated on May 29, 2012. However, S.T. and Father did not join in this appeal. Mother also has an older son who has lived with his maternal grandmother since birth. He was not involved in these proceedings.

children to be CHINS on May 6, 2010 after Mother and Father admitted to allegations in CHINS

petition. During the same hearing, the juvenile court advised Mother and Father of their rights.

The court entered its dispositional order and Participation Decree on May 17, 2010. Among

other things, Mother and Father were ordered to:

1. Notify the caseworker of changes in address, household composition or telephone number within five (5) days of said change.
2. To the extent that Mother is ordered to engage in programs, she is required to enroll in that program within 30 days and participate as scheduled without delay or missed appointments. All required assessments must be completed within 30 days.
3. Contact the caseworker every week to allow the caseworker to monitor compliance with this Court's orders in this case. The contact may be in person, by letter, or by telephone.
4. Secure and maintain a legal and stable source of income adequate to support all household members as well as children.
5. Obtain and maintain suitable housing and adequate bedding, functional utilities, a supply of food and food preparation facilities and that the home remain home [sic] and safe for all residing within.
6. Participate and successfully complete a homebased counseling program with the children and successfully complete any recommendation of the counselor.
7. Complete parenting assessment and successfully complete all recommendations developed as a result of the parenting assessment. Such recommendations may include Parenting Classes, Home-Based Counseling Services, or other Counseling Services.
8. Participate in and successfully complete a drug and alcohol assessment and successfully complete all recommendations made by the evaluations including intensive out-patient (IOP) treatment or in-patient treatment.
9. Submit to random drug testing as recommended by [the] substance abuse treatment program.
10. Participate in a program addressing issues of domestic violence.
11. Obtain GED's. Father must participate in a psychological evaluation and follow all recommendations.

Pet. Ex. 3 p. 11-12.

Both parents' participation in court-ordered services was inconsistent and ultimately

unsuccessful. Mother's MCDCS caseworker testified that she frequently had to call Mother's

mother to reach Mother because Mother's phone would not work. During the course of the

CHINS proceedings, the caseworker did not always know where Mother was living. For at least

part of this unaccounted for time, Mother lived with her own father, a drug addict. Mother held

3

three different jobs during the two years of the CHINS case. All three jobs added up to a total of 6 months of employment. She was downsized from one job, and she quit the other two positions. She testified that it was difficult for her to find work because of her previous conviction for felony prescription fraud. There was no evidence in the record that either Mother or Father made any progress or attempts toward a GED. At the time of the termination hearing, Mother was unemployed.

Mother moved every 3-4 months during the course of the CHINS proceeding. She lived at least four different residences. Mother and Father found two suitable living spaces for the three children. Mother and Father had to move from one residence after drug dealers broke the windows in an attempt to recover past debts. The parents blamed each other for the debt, each saying that the other one owed the balance. At the time of the termination hearing, Mother was living by herself in a one bedroom apartment. A relative was paying the rent for her.

After two referrals, Mother did have a psychological evaluation. Mother claims that she was diagnosed with Post Traumatic Stress Disorder, Anxiety, Severe Depression, Personality Disorder, and Drug Dependence. The psychological evaluation recommended that Mother see a psychiatrist. While Mother testified that she did see a psychiatrist and was taking Paxil, she never provided any proof of the meeting or that she had a prescription for the medication. After two referrals, Mother did successfully complete her parenting classes.

Mother also participated in home-based counseling services through St. Vincent's New Hope. The counselor recommended that both parents attend Narcotics Anonymous meetings. Neither parent complied. During a counseling session in mid-March 2011, Mother and Father argued and Father required Mother and the counselor to leave the home. After this incident, the counselor recommended that Mother and Father separate in order to work on their own, individual drug recoveries. However, Mother and Father were back together in the same home

4

within a week of this recommendation. Mother and Father self-reported drug use during some of their sessions.

Mother and Father separated in December 2011 only after Father did not appear for a court date. Mother and Father were not together at the time of the termination hearing. Home Based Counseling was terminated shortly thereafter in late January 2012 after Mother missed three consecutive appointments. At the time that home based counseling ended, the counselor testified that Mother was in a downward emotional spiral. He felt that Mother and Father were in the same basic position that they were in when counseling started. He did not recommend reunification. Although, he believed the parents would benefit from additional counseling, he did not think that additional counseling would help to alleviate his concerns in the near term.

Mother was referred for drug screening four times. Each referral lasts for ten weeks, and a patient is unsuccessfully discharged after four consecutive weeks of non-reporting. Mother successfully completed her first and third referrals. She was unsuccessfully discharged from her second and fourth referrals. In total, Mother was ordered to complete 72 drug screens. She completed 53 and tested positive for Oxycodone once. In July 2010, Mother admitted to her caseworker that she had used cocaine and that she and Father had gotten into a huge argument. Mother appeared bruised and blistered during this conversation. Mother did complete a drug and alcohol class and domestic violence treatment.

Mother was allowed to have supervised visits with the children once a week for two hours. The DCS Visitation Supervisor would transport the children to and from each visit. Mother cancelled one of these visits each month. Twice the visits were cancelled while the children were already in the car on the way to meet Mother. These visits were very hard for the children. They would frequently cry during the drives back and forth, and they would act out for a few days after each visit. S.T., the middle child, would have the most negative reactions. He

often suffered from nightmares and acted out for both the foster parents and his therapist for a few days after visiting with Mother. While all of the children's visits were terminated in December 2011 or January 2012, S.T.'s therapist requested that his visits be terminated sooner due to his negative reactions. Mother would struggle with discipline during these visits despite training. The DCS Visitation Supervisor never could recommend unsupervised visits with the children based on her observations.

The juvenile court conducted a review hearing on August 23, 2010. MCDCS reported that both parents tested positive for cocaine and Mother has missed three scheduled appointments. During the February 28, 2011 review hearing, Mother was found to be inconsistent with services. The juvenile court conducted a permanency hearing on May 23, 2011. After that hearing, the court ordered concurrent plans for adoption and reunification finding: 1) Parents failed to complete any services despite second referrals; 2) None of the service providers recommended a changed placement for the children; 3) DCS and the GAL agreed that the plan should be changed to adoption; 4) Parents admitted that they continued to use drugs; 5) Parents did not follow home-based recommendations, continued to live together against recommendations, were so far behind that even another nine months would not be enough time, and they allowed a family to live with them when they knew that the family member abused drugs; and 6) Parents were recently involved in a dispute. Despite the change in plans, the court continued Mothers' home-based services and parenting time.

MCDCS filed a Petition for Termination on September 6, 2011. On December 5, 2011, the juvenile court conducted a second Permanency Hearing where it suspended Mother's visits with S.T. based on the recommendations of the GAL and the child's therapist and changed the permanency plan to adoption because 1) Parents missed three drug screens; 2) S.T. was very upset and disruptive after visits, and 3) A.A. needed permanency. On December 6, 2011, there

was a family-team meeting at maternal grandmother's ("Grandmother") home. Mother, Grandmother, the MCDCS case worker, and home-based counselor were present. Father was present but refused to participate. The children's therapist arrived late. When she arrived an hour late, both the MCDCS case worker and home-based counselor had already left. The children's therapist stayed only a short time because Grandmother had "become erratic and was crying hysterically . . . ." Tr. p. 189. The therapist left because she felt threatened by Grandmother.

During a consolidated evidentiary hearing, MCDCS presented substantial evidence concerning Mother's history of substance abuse and ongoing struggles with addiction, Mother's criminal record, Mother's unstable housing arrangements, Mother's inability to maintain stable employment, and Mother's lack of compliance with services. Finally, MCDCS presented evidence that the children were living together and showing vast improvement in pre-adoptive foster care.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On May 29, 2012, the trial court entered its judgment terminating Mother, Father, and S.T.'s parental rights to A.A., S.T., and C.P. This appeal ensued.

**Discussion and Decision**

We begin our review by acknowledging that when reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

7

Where, as here, the juvenile court enters findings of fact and conclusions of law in its termination of parental rights, our standard of review is two-tiered. In re J.H., 911 N.E.2d 69, 73 (Ind. Ct. App. 2009), trans. denied. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. In re C.G., 954 N.E.2d 910, 923 (Ind. 2011). "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. C.G., 954 N.E.2d at 923.

The Fourteenth Amendment to the United States Constitution protects the traditional rights of parents to establish a home and raise their children. Id. However, a juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a request to terminate parental rights. In re K.S., 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. Id.

A request to terminate a parent's rights is not made lightly, and before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

    (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)     that termination is in the best interests of the child; and

8

     (D)     that there is a satisfactory plan for the care and treatment of
              the child.

Ind. Code § 31-35-2-4(b)(2). "The State's burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). If the trial court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). Mother challenges the sufficiency of the evidence supporting the trial court's conclusions as to subsections (b)(2)(B) of the termination statute cited above. See I.C. § 31-35-2-4(b)(2).

**Remediation of Conditions**

Initially, we observe that Indiana Code section 31-35-2-4(b)(2)(B) requires a trial court to find that only one of the three elements of subsection (b)(2)(B) has been established by clear and convincing evidence before properly terminating parental rights. See L.S., 717 N.E.2d at 209. Because we find it to be dispositive, we limit our review to Mother's allegations of error pertaining to subsection (b)(2)(B)(i) of Indiana's termination statute, namely, whether MCDCS presented clear and convincing evidence establishing that there is a reasonable probability the conditions leading to the removal and continued placement of A.A., S.T. and C.P. outside Mother's care will not be remedied.

When making a determination as to whether there is a reasonable probability that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation

9

of the child." Id. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied. The trial court may also consider any services offered to the parent by the local Indiana Department of Child Services office (here, MCDCS) and the parent's response to those services, as evidence of whether conditions will be remedied. Id. Moreover, MCDCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Mother acknowledges on appeal that she was not in full compliance with (1) drug screens, (2) home-based counseling, (3) consistency in housing, and (4) adequate employment. Nevertheless, she insists that she has "demonstrated that the conditions that led to the removal of her children can be remedied and that continuing the parent-child relationship with each of her children poses no threat to their well-being because she has made tangible efforts to establish[ing] and maintain[ing] a stable home environment." Appellant Mother's Br. at 9. Mother therefore contends that the trial court committed reversible error in terminating their parental rights.

Here, the trial court entered numerous, detailed findings in its judgment regarding Mother's unresolved struggle with substance abuse, inconsistent housing, and inadequate employment. After the psychological evaluation recommended that Mother see a psychiatrist, the court found that Mother claimed she met with a psychiatrist, but never provided any verification of the meeting or a copy of the psychiatrist's report to the court.

The court further found that "there is a reasonable probability that the conditions that resulted in the children's removal and continued placement outside the home will not be

remedied by their mother," because "she started missing appointments to the point that she was discharged out of random screens, visitation, and home based services." Appellant App. p. 42 The court determined that mother missed 19 urine screens and was discharged as a result. In so doing, the trial court was "not convinced that issues of mental health and substance abuse have been adequately addressed." Appellant App. p. 42.

The trial court further found that unstable housing and employment, an issue at the beginning of the CHINS case, and an issue throughout the CHINS case, "remains a condition to remedy at the present time [May 2012]." Appellant App. p. 42. At the time of the termination order Mother was living in a one bedroom residence paid for by others. Mother had been unemployed for three years prior to the CHINS filing and obtained three jobs that lasted approximately six months collectively since the CHINS was filed. Appellant App. p. 41.

During the termination hearing, it was the overwhelming consensus of case managers and service providers that Mother had made little or no progress with her mental health issues and/or ability to provide the children with a safe and stable home environment. Specifically, when home base coordinator Bruce Joray ("Joray") was asked if the parents had successfully addressed their problems by the end of counseling, he responded, "No. It felt like they were at the same spot they were [in] when I got on the case. Just in a different house." Tr. p. 83. MCDCS Visitation Supervisor, Star Harris, could not recommend unsupervised visits because of S.T.'s behavior and Mother's inability to consistently redirect him. MCDCS family case worker, Brittny Smith, could not recommend placing the children with Mother due to her unemployment, lack of suitable housing, and continued struggle with mental health issues that had yet to be adequately addressed. The children's therapist, Kristina Ray-Bennett, recommended terminating S.T.'s supervised visits with Mother early because of his negative reactions after the visits. The children's guardian ad litem with Child Advocates, Brian Robinson, asserted that it would be in

11

the children's best interests for parental rights to be terminated because of the lack of consistent progress on the part of the parents and their failure to receive positive recommendations from other service providers as well as a current lack of appropriate housing. Tr. p. 203.

As noted earlier, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. D.D., 804 N.E.2d at 266. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing services, in conjunction with unchanged conditions, supports a finding that there exists no reasonable probability that the conditions will change." Lang v. Starke Cnty. Office of Family & Children, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), trans. denied. Moreover, we have previously explained that "simply going through the motions of receiving services alone is not sufficient if the services do not result in the needed change." In re J.S., 906 N.E.2d 226, 234 (Ind. Ct. App. 2009). After reviewing the record, we conclude that MCDCS presented clear and convincing evidence to support the trial court's findings and ultimate determination that there is a reasonable probability the conditions leading to A.A., S.T., and C.P.'s removal and/or continued placement outside of Mother's care will not be remedied. The parents' arguments to the contrary amount to an impermissible invitation to reweigh the evidence. See D.D., 804 N.E.2d at 265. Accordingly, we find no error.

**Conclusion**

MCDCS presented clear and convincing evidence to support the juvenile court's findings and ultimate determination that there is a reasonable probability that the conditions leading to A.A., S.T., and C.P.'s removal or continued placement outside of Mother's care will not be remedied. Under applicable statutory standards, we need address no other arguments advanced by Mother. We therefore affirm the judgment of the juvenile court.

Affirmed.

KIRSCH, J., and CRONE, J., concur.